BRIAN T. SCOTT *v.* STATE BAR EXAMINING COMMITTEE
(14210)

PETERS, C. J., SHEA, CALLAHAN, GLASS and BORDEN, Js.

Argued November 7, 1991—decision released January 14, 1992

*Dan E. LaBelle,* with whom, on the brief, was *Thomas P. Moriarty,* for the appellant (respondent).

*David J. Laudano,* with whom, on the brief, was *Raymond W. Ganim,* for the appellee (petitioner).

PETERS, C. J. The dispositive issue in this appeal is the scope of the Superior Court's authority to review the decision of the Connecticut bar examining committee denying an applicant's admission to the bar. After receiving the application of the petitioner, Brian T. Scott, to take the state bar examination and for admission to the bar of this state, and after he had passed the bar examination, the Fairfield county committee on admission to the bar (standing committee) interviewed him, and voted unanimously to recommend that he be admitted to the bar. Thereafter, however, the respondent bar examining committee (BEC), through its executive committee, conducted its own investigation and, upon finding that the petitioner did not possess the present good moral character and the requisite fitness for admission to the bar, rejected his application for admission. The petitioner sought review in the Superior Court, claiming that the BEC had acted arbitrarily, unreasonably or in abuse of its discretion

in making its decision.[1] The trial court, *Hon. Irving Levine,* state trial referee, rendered a judgment ordering the petitioner admitted to the bar after concluding that the "[BEC] could not fairly and reasonably have reached the conclusion that it did." From that judgment, the BEC appealed to the Appellate Court and, pursuant to Practice Book § 4023, we transferred the appeal to this court. We reverse the judgment of the trial court.

The record, briefs and appendices of the parties reveal the following facts. The petitioner used marihuana from 1977 to 1985, a period of eight years. This period of drug use resulted in numerous arrests and three convictions for possession of marihuana and controlled substances.[2] Although the petitioner had dropped out of high school in his junior year, he subsequently received his high school graduate equivalency

---

[1] Specifically, the petitioner claimed that the ultimate recommendation of the BEC was not based on the subordinate facts found; that the BEC lacked adequate guidelines or standards for its determination as to whether the petitioner was of good moral character; that it rendered the findings of the standing committee a nullity by conducting a de novo hearing; that the BEC acted as an appellate-type committee without any statutory guidelines or regulations to guide it in such an appellate capacity; and that the BEC deprived him of his constitutional rights by prohibiting him from presenting general character witnesses at the hearing.

[2] In 1981, the petitioner was arrested and charged with possession of controlled drugs and possession of marihuana. The possession of controlled drugs charge was nolled and the petitioner paid an $85 fine for possession of marihuana. He was convicted of possession of marihuana for a second time in 1983 and paid a $385 fine. The petitioner's last drug related conviction occurred in 1984, when he was arrested and charged with interfering with a police officer and possession of a controlled substance. The interference charge was nolled, and he paid a $250 fine for possession of a controlled substance. The petitioner has also been cited for failing to register a change of address with the motor vehicles department, failure to carry his registration, illegal dumping, failure to carry an insurance card, making an improper left turn and failure to have insurance. Furthermore, at the age of seventeen, he was adjudicated as a youthful offender on a charge of criminal attempt to commit burglary.

diploma. He began taking courses at the University of Bridgeport and eventually graduated with a bachelor's degree. He then enrolled at the University of Bridgeport law school and received a law degree.

Following graduation from law school, the petitioner filed an application to take the bar examination and for admission to the bar. He properly revealed his criminal record on the application. The petitioner took the state bar examination on July 29 and 30, 1987. On November 6, 1987, the BEC notified the petitioner that he had passed the examination; however, on November 19, 1987, it advised the petitioner that he was ineligible for admission to the bar. On December 23, 1987, three members of the standing committee conducted a hearing in which the petitioner was questioned about his prior drug use and criminal record. On January 11, 1988, the standing committee notified the petitioner that it had voted unanimously to approve his admission to the state bar. Soon thereafter the BEC notified the petitioner that its executive committee intended to hold a factfinding hearing, on February 19, 1988, concerning his qualifications for admission to the bar. The notice informed the petitioner that the specific area of inquiry was to be his criminal record. It further advised the petitioner that he could bring an attorney as well as "any documents or witnesses relevant to the area of inquiry" but that "[g]eneral character witnesses [would] not be permitted." The petitioner appeared without counsel and responded to extensive questioning.

On May 20, 1988, the members of the executive committee voted unanimously to deny the petitioner admission to the bar.[3] Each voting member placed the reason

---

[3] Although five members of the executive committee participated in the factfinding hearing, the minutes reflect that only three voted on the petitioner's application at the subsequent executive session.

for his vote on the record. The minutes reflect that one member found that the petitioner's "explanation of the facts and events involving his criminal prosecution confirmed in [the member's] mind the belief that the [petitioner's] testimony before the executive committee . . . was not credible." Another member "was of the opinion that the applicant displayed a lack of candor and did not appreciate the importance of his testimony" at the hearing. The final member's "opinion that the applicant was unfit to practice law . . . was based upon the applicant's conviction in three criminal cases involving illegal substance abuse." The BEC notified the petitioner that it found him to be lacking the present good moral character and the requisite fitness for admission to the bar, and that it therefore was rejecting his application for admission to the bar. The petitioner then filed a petition with the Superior Court, which, without hearing any additional testimony,[4] ordered his admission to the bar.[5]

On appeal, the BEC challenges the propriety of the trial court's rejection of its decision, claiming that questions of good moral character in the attorney admission process are properly delegated to the discretion of the BEC. The petitioner claims that: (1) the BEC lacks standing to bring this appeal; (2) even if this

---

[4] Although the petitioner's counsel offered the testimony of the petitioner "to explain to the court that area of mix-up on the criminal proceedings" and to give the court "some kind of an idea as to what kind of a person he is," the court declined to hear the testimony, noting that it was "required to judge this on the basis of what was submitted to the Bar Examining Committee." The court did, however, hear arguments from counsel on both sides.

[5] Just prior to the hearing on the petition filed in the Superior Court, the attorneys for the BEC and the petitioner agreed to have it postponed pending another hearing on the petitioner's application by the executive committee on November 17, 1989. Following that hearing, the executive committee voted three to two to stand by its original negative recommendation. As the BEC provided no reason for its decision to abide by the original recommendation, the trial court declined to review the second hearing.

appeal is properly before this court, the trial court acted within its discretion; and (3) as an alternate ground for affirming the judgment of the trial court, the BEC deprived the petitioner of his due process rights to notice, to an adequate opportunity to rebut evidence and to present evidence and testimony.

I

"Fixing the qualifications for, as well as admitting persons to, the practice of law in this state has ever been an exercise of judicial power." *Heiberger* v. *Clark,* 148 Conn. 177, 185, 169 A.2d 652 (1961); *State Bar Assn.* v. *Connecticut Bank & Trust Co.,* 145 Conn. 222, 232, 140 A.2d 863 (1958); *O'Brien's Petition,* 79 Conn. 46, 55, 63 A. 777 (1906), overruled on other grounds, *In re Application of Dinan,* 157 Conn. 67, 72, 244 A.2d 608 (1968). "This power has been exercised with the assistance of committees of the bar appointed and acting under rules of court." *In re Application of Warren,* 149 Conn. 266, 272, 178 A.2d 528 (1962); *Heiberger* v. *Clark,* supra, 183. In addition to establishing the BEC, the rules of practice provide for a standing committee on recommendations for admission in each county. Practice Book §§ 11, 19. "Although these committees have a broad power of discretion, they act under the court's supervision. *In re Application of Dodd,* 132 Conn. 237, 244, 43 A.2d 224 [1945]; see *Grievance Committee* v. *Broder,* 112 Conn. 263, 265, 152 A. 292 [1930]. It is the court, and not the bar, or a committee, which takes the final and decisive action. *Heiberger* v. *Clark,* supra, 183, and cases cited therein." *In re Application of Warren,* supra.

The petitioner properly presented a petition to the Superior Court for review of the BEC's negative recommendation. *Heiberger* v. *Clark,* supra, 182. The Superior Court, however, has only limited discretion to accept or reject the BEC's recommendation on

admission. The hearing on the petition is not de novo. Rather, the Superior Court must review the BEC's decision on its record to determine whether it has conducted a fair and impartial investigation. *In re Application of Warren,* supra, 273–74. "It has been the established practice for the court to decline to hear evidence on questions entrusted to bar committees. *O'Brien's Petition,* [supra, 55]; *In re Application of Warren,* supra, 273. This practice applies in cases such as the present one where the issue involves an exercise of the committee's discretion. *In re Application of Warren,* supra. . . . [T]he court will determine whether the committee acted fairly and reasonably or from prejudice and ill will in its consideration of the application." *In re Application of Koenig,* 152 Conn. 125, 133, 204 A.2d 33 (1964). "[T]he issue before the court is whether the committee or the bar, in withholding its approval for admission, acted arbitrarily or unreasonably or in abuse of its discretion or without a fair investigation of the facts." *In re Application of Warren,* supra.

## A

We first address the petitioner's claim that the BEC lacks standing to bring this appeal. He contends that, "[b]eing an arm of the trial court, the Appellant Committee cannot suffer any injury because it cannot be argued that the trial court has injured itself." We disagree. In *Grievance Committee* v. *Broder,* supra, which involved a grievance committee appeal from a decision of the trial court, we stated: "If the disbarred attorney should have the opportunity to have reviewed by the highest tribunal of the State an alleged unreasonable exercise of discretion by the trial court, or some irregularity or unfairness in the conduct of the proceedings, equally should it be the right of the court and the public and the due of the proper administration of justice that an exercise of discretion, claimed to be unrea-

sonable to the court and the public and the administration of justice, should be reviewed. The granting of an appeal to the disbarred attorney and the denial of a like appeal to the representative of the public interest would be an unheard of procedure in this jurisdiction. The Supreme Court . . . is the court of last resort for the correction of errors of law and it is only by an appeal to it that such errors may be finally determined. . . . To deny an appeal to the representative of the public interests involved would leave the decision to the uncontrolled discretion of a single judge and prevent a review of the procedure followed by him no matter how irregular, unfair or arbitrary to the public interest concerned." Id., 267–68. The rationale for allowing the grievance committee to appeal a judgment of the trial court applies with equal force to an appeal by the BEC.

## B

Before discussing the propriety of the trial court's actions in rejecting the BEC's recommendation and in ordering the petitioner's admission to the bar, we must consider what weight, if any, the BEC was required to give the standing committee's recommendation to admit the petitioner. The rules of court provide that all applications for admission to the bar "shall be referred to the committee for the county in which the applicant seeks admission, which shall investigate the general fitness of each applicant and report to the bar of the county whether the applicant has complied with the rules relating to admission to the bar, is a person of good character and should be admitted." Practice Book § 19. It is the BEC, however, that has the ultimate "duty, power and authority . . . to determine whether such candidates are qualified as to . . . morals and fitness; and to recommend to the court for admission to the bar qualified candidates." Practice Book § 13. In this case, although the standing commit-

tee recommended admission to the bar, the BEC recommended to the court that the petitioner's application be denied.[6] The trial court stated that the BEC should have given "[s]ome weight . . . to the Fairfield County Standing Committee's recommendation that he had good moral character and should be admitted." We disagree.

The BEC's hearing on an application for admission to the bar may be conducted de novo without any consideration of the standing committee's findings. This is especially appropriate, when, as in a case such as this, the BEC hears testimony of a witness whose credibility and candor are at issue. Accord *Character Committee* v. *Mandras,* 233 Md. 285, 288, 196 A.2d 630 (1964). Having concluded that the BEC's hearing was properly conducted de novo, we hold that the trial court should have considered only the BEC's findings and recommendation, and not the findings and recommendation of the standing committee.

## C

"A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualifications must have a rational connection with the applicant's fitness to practice law." *Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 239, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957). To be admitted to the bar of this state, an applicant must possess certain educational qualifications and must demonstrate his proficiency in the law by successfully completing the bar examination. Practice Book § 16 (4) and (6). Of equal importance, "[g]ood moral character is a necessary and proper qualification for admission to the bar. *Fairfield County Bar* v. *Tay-*

---

[6] The members of the executive committee had before them the transcript of the standing committee's hearing prior to voting on the petitioner's application.

*lor,* 60 Conn. 11, 17, 22 A. 441 [1891]; *Grievance Committee* v. *Broder,* 112 Conn. 263, 277, 152 A. 292 [1931]; note, 64 A.L.R.2d 301[; Practice Book § 16 (3)]. In this state, the ultimate burden of proving good character rests upon the applicant. *In re Application of Warren,* [supra, 274]." *In re Application of Koenig,* supra, 132. One court has noted that, "[w]hile there is no litmus test by which to determine whether an applicant for admission to the Bar possesses good moral character . . . no moral character qualification for Bar membership is more important than truthfulness and candor." *In re Application of Allan S.,* 282 Md. 683, 689, 387 A.2d 271 (1978). " 'It is not enough for an attorney that he be honest. He must be that, and more. He must be believed to be honest. . . .' " *O'Brien's Petition,* supra, 53, quoting *Fairfield County Bar* v. *Taylor,* supra, 17.

In the present case, the trial court rejected the negative recommendation of the BEC and concluded that "the lack of credibility and candor have not been borne out by the transcript of the hearing and it therefore follows that an abuse of discretion occurred." Although courts in other jurisdictions undertake an independent evaluation of an applicant's present moral character; see *In re Application of Allan S.,* supra, 690–91; *Application of Strait,* 120 N.J. 477, 479, 577 A.2d 149 (1990); in this state the court merely reviews the record to ascertain whether the BEC's findings are supported by adequate facts. Although the BEC is not an administrative agency; cf. *Sobocinski* v. *Statewide Grievance Committee,* 215 Conn. 517, 526, 576 A.2d 532 (1990) (statewide grievance committee is not an administrative agency); but see *In re Willis,* 288 N.C. 1, 16, 215 S.E.2d 771, appeal dismissed, 423 U.S. 976, 96 S. Ct. 389, 46 L. Ed. 2d 300 (1975) (board of law examiners is an administrative agency); the Superior Court's review of its conclusions is similar to the review afforded to an administrative agency decision. As such,

the Superior Court's role in reviewing a petition for admission is not that of factfinder. We have repeatedly stated that "[t]he trier of the facts determines with finality the credibility of witnesses and the weight to be accorded their testimony." (Internal quotation marks omitted.) *State* v. *Crump,* 201 Conn. 489, 491, 518 A.2d 378 (1986). Even in those jurisdictions in which courts undertake independent evaluations, there is often a presumption that a bar examining committee's findings of fact are correct or at least entitled to weight "where based upon the testimony of witnesses whose credibility may be in issue." See *In re Application of Allan S.,* supra, 691.

Our judicial review is limited, therefore, to determining whether the statements of the two executive committee members concerning candor and credibility,[7] and

[7] We decline to consider the propriety of the statement of the third voting executive committee member to the effect that the petitioner's three prior criminal convictions involving illegal substance abuse justified a finding of lack of fitness to practice law. Although this court has never specifically held that an applicant's criminal record may provide a per se justification for refusing him admission to the bar, we have allowed great weight to be placed on a prior conviction. In *O'Brien's Petition,* 79 Conn. 46, 56–57, 63 A. 777 (1906), overruled on other grounds, *In re Application of Dinan,* 157 Conn. 67, 244 A.2d 608 (1960), this court stated that "[i]f it be assumed that, during the time that has elapsed since [the applicant escaped from custody while under arrest and then telephoned and offered to return if his bond would be lowered], the petitioner's course of life has been altogether exemplary, this could not wholly efface the stain upon his character. Standing alone, [the wrongful acts] are sufficient to support the action of the bar in refusing to rank him among those whom they, acting under their oath of office, could recommend to the representatives of the State as 'entitled to the confidence of the community.' " The constitutionality of denying admission to the bar solely on the basis of any past criminal act was placed into doubt by the United States Supreme Court's opinion in *Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 243, 246–47, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957). In that case, the court stated that the nature of an offense must be taken into account in determining whether the commission of an offense is rationally connected to a person's moral character. But see *In re Willis,* 288 N.C. 1, 17, 215 S.E.2d 771, appeal dismissed, 423 U.S. 976, 96 S. Ct. 389, 46 L. Ed. 2d 300 (1975) (court unable to con-

consequently their ultimate determination of present fitness to practice law, find support in the record of the application proceedings. We reject the contention of the petitioner that we should focus instead on whether the trial court committed a manifest abuse of discretion resulting in an injustice. The standard of review in cases involving admission or readmission to the bar has been clear since it was announced by this court in 1906 in *O'Brien's Petition,* supra, 55–56 (court merely inquires "whether the approval of the bar was withheld after a fair investigation of the facts"). See also *In re Application of Dinan,* supra, 71 (readmission); *In re Application of Koenig,* supra, 133–34 (readmission); *In re Application of Warren,* supra, 273 (admission); *Rosenthal* v. *State Bar Examining Committee,* 116 Conn. 409, 417, 165 A. 211 (1933) (admission). Because the trial court exercises no discretion, but rather is confined to a review of the record before the BEC, we are not limited to the deferential standard of "manifest abuse" or "injustice" when reviewing its legal conclusions about the adequacy of the evidence before the BEC.[8] See *Canaan National Bank*

---

clude that evidence of prior criminal record, including a burglary arrest and convictions for trespass, driving while intoxicated, and driving in violation of a limited driving permit, did not justify the board of law examiners' conclusion that the applicant did not possess good moral character). We need not resolve this issue in this case.

[8] To the extent that *In re Application of Pagano,* 207 Conn. 336, 344, 541 A.2d 104 (1988), in dictum, states that we engage in a limited review of a trial court's judgment in a readmission case, it is incorrect. The cases cited therein for this proposition involve actions for disbarment and suspension of practicing attorneys. The trial court has always maintained a large degree of discretion in such cases, thus necessitating a limited scope of review by this court. See *Grievance Committee* v. *Broder,* 112 Conn. 263, 266, 152 A. 292 (1930) (review of disbarment proceedings); *Grievance Committee* v. *Ennis,* 84 Conn. 594, 602, 80 A. 767 (1911) (review of suspension proceedings); *In re Durant,* 80 Conn. 140, 149, 67 A. 497 (1907) (review of disbarment proceedings). In *Pagano,* we were reviewing the trial court's decision to accept the recommendation of the standing committee to readmit a disbarred attorney. We properly reviewed the record before the stand-

v. *Peters,* 217 Conn. 330, 335, 586 A.2d 562 (1991); *Connecticut National Bank & Trust Co.* v. *Chadwick,* 217 Conn. 260, 266–67, 585 A.2d 1189 (1991).

In this case, although the executive committee members did not articulate the precise facts underlying their ultimate conclusions, their failure to do so is not reversible error. "The committee should ordinarily find only the ultimate facts. If the committee has reason to believe that its conclusions from subordinate facts will be questioned, it *may* also state the subordinate facts. The ultimate facts are reviewable by the court to determine whether they are reasonable and proper in view of the subordinate facts found and the applicable principles of law. *Cohn* v. *Hartford,* 130 Conn. 699, 706, 37 A.2d 237 [1944] . . . ." (Citation omitted; emphasis added.) *In re Application of Koenig,* supra, 132–33 (reviewing an application for readmission to the bar).

While the trial court dismissed the two executive committee members' concerns about the petitioner's apparent lack of credibility and candor at the February 19, 1988 hearing, the transcript reveals support for their concerns. Apart from the prior criminal record standing alone as a possible basis for a finding of lack of present fitness, the petitioner's explanations of his prior criminal record adequately support the BEC's findings. The executive committee members might have found not believable the petitioner's offhand explanation for why he had Fiorinal, a controlled substance, in his possession on two of the occasions when he was also arrested for marihuana possession. The only explanation offered by the petitioner was that his mother or his girlfriend's mother had given him the drug for a "neck problem." The same explanation was offered

---

ing committee and concluded that it disclosed "an abundance of credible evidence . . . to support its conclusion of the petitioner's current fitness to practice law." *In re Application of Pagano,* supra, 345.

for his possession of the drug on two occasions over a period of two and one-half years. The members might have determined that the petitioner did not take their questioning seriously when, in response to further questions regarding the Fiorinal possession, the petitioner stated that Fiorinal was "just a muscle relaxer" and it "just—happened to be in my possession at the time." Similarly, the executive committee members might have doubted the petitioner's candor when discussing the circumstances surrounding his arrest for interfering with a police officer. When questioned about that charge, the petitioner responded that he had been in a car with others and that all he did was walk away from police who had stopped the car because he "knew there was mari[h]uana in the car and if [he] was found in the car, that [he] would be facing a felony charge with a jail term and [he] wasn't about to sit around for that." Moreover, the committee members might have inferred a lack of sincerity in the petitioner's overall explanation when pressed on the subject of why he had been arrested so often for possessory offenses. In response to a question on this subject, the petitioner stated, "I guess I just have bad luck, it's the only explanation. It was stupid, foolish and also I didn't have very good luck. I don't know what else to say. It's almost like a phenomenon."

It was improper for the trial court in this case to substitute its own assessment of the petitioner's credibility and candor for that of the BEC. Unlike the members of the executive committee, the trial court did not have the benefit of viewing the petitioner's demeanor when he testified at the hearing before the BEC. In drawing its own conclusions as to these factors, the trial court stripped the BEC of authority to determine qualities such as candor and credibility when assessing the moral fitness of an applicant for membership in the state bar. The Superior Court rules specifically dele-

gate to the BEC "the *duty, power and authority* to
. . . determine whether such candidates are qualified
as to prelaw education, legal education, *morals and fit-
ness* . . . ." (Emphasis added.) Practice Book § 13.
"[S]atisfaction of the requirement of moral character
involves an exercise of delicate judgment on the part
of those who reach a conclusion, having heard and seen
the applicant for admission, a judgment of which it may
be said as it was of 'many honest and sensible judg-
ments' in a different context that it expresses 'an intu-
ition of experience which outruns analysis and sums
up many unnamed and tangled impressions; impres-
sions which may lie beneath consciousness without los-
ing their worth.' " *Schware* v. *Board of Bar Examiners,*
353 U.S. 232, 248, 77 S. Ct. 752, 1 L. Ed. 2d 796 (1957)
(Frankfurter, J., concurring). Because there was evi-
dence in the record that supported the BEC's findings
about the petitioner's lack of credibility and candor,
and, consequently, his moral character and fitness to
practice law, we conclude that the trial court should
not have disturbed those findings.[9]

## II

The petitioner contends, as an alternate ground for
affirming the trial court's judgment, that the BEC vio-
lated his constitutional right to procedural due process
when it questioned him at the February 19, 1988, hear-
ing about matters of which he had no notice and when
it prohibited him from presenting general character
witnesses on his behalf. We disagree.

"In cases in which admission to the bar is to be denied
on the basis of character . . . the applicant, at some

---

[9] In concluding that the BEC's findings of fact were adequately supported
in the record, we do not reach the more elusive issue of what factors should
be considered in determining whether an applicant to the bar possesses
moral character and fitness to practice law. See generally D. Rhode, "Moral
Character as a Professional Credential," 94 Yale L.J. 491 (1985). This issue
was neither raised on appeal nor briefed by the parties.

stage of the proceedings prior to the denial, must be adequately informed of the nature of the evidence against him and be accorded an adequate opportunity to rebut this evidence." *In re Application of Dinan,* 157 Conn. 67, 72, 244 A.2d 608 (1968). "[T]he applicant should be given a reasonable opportunity to rebut or explain any adverse evidence." *In re Application of Warren,* supra, 274; see *Konigsberg* v. *State Bar of California,* 353 U.S. 252, 77 S. Ct. 722, 1 L. Ed. 2d 810 (1956).

Although not represented by counsel, the petitioner, a law school graduate, did not object to the notice he had been given nor to the fact that he was prohibited from presenting general character witnesses[10] at the time of the first hearing. Moreover, on November 17, 1989, the BEC conducted a second hearing at which the petitioner and his counsel were present. See footnote 5, supra. At that time, the chairman of the executive committee informed the petitioner's counsel that he was "free to present anything that [he] consider[s] relevant, whether it involves his criminal record or it involves anything, any other matter, which [he] consider[s] essential to the presentation of Mr. Scott's case before the committee." Moreover, the chairman stated that the committee was "giving the widest possible latitude."[11] The petitioner did not offer any additional evidence at that time, nor did he ask for a continuance

---

[10] Notwithstanding the petitioner's claim that he was prohibited from presenting evidence of his general character, the BEC apparently had before it letters that had been submitted to the standing committee by a Superior Court judge, the petitioner's brother, who is an attorney, and an assistant clerk at the Milford Superior Court, all attesting favorably to the petitioner's character.

[11] Apparently there was some misunderstanding about the precise scope of the second hearing. The petitioner's counsel explained to the trial court that it was his understanding that the second hearing was "for the purpose of explaining to the Committee that narrow issue of whether or not he had a problem with drugs."

in order to prepare for a full hearing. He merely stated that he was "not waiving" any of his rights concerning the pending appeal. Before the trial court, the petitioner stated that "under no circumstances would [he] have agreed to a continuance [on the petition] and for another hearing at that time . . . ."

We are persuaded that the BEC corrected any possible due process violations as to notice and to the prohibition on general character witnesses by giving the petitioner an opportunity to present evidence involving "his criminal record or . . . any other matter, which [he] consider[s] essential to the presentation" of his case. Had the Superior Court considered the petitioner's allegations of procedural due process violations with respect to the first hearing, and had it concluded that the BEC had deprived the petitioner of his constitutional right of due process, the only appropriate remedy would have been to recommit the case to the BEC for further proceedings consistent with the petitioner's right to procedural due process. *In re Application of Warren*, supra, 275. Accordingly, the most the petitioner could have achieved from his petition to the Superior Court, with respect to the procedural due process claims, was a second hearing. Because the BEC afforded the petitioner an opportunity to present additional evidence, we conclude that his right to procedural due process was not violated.

## III

Because the Superior Court has the ultimate power to grant or deny an applicant admission to the bar; General Statutes § 51-80; our holding today merely reverses the trial court's judgment ordering the petitioner admitted to the bar. It does not constitute a denial of the petitioner's application. Should the record remain in its present state, our holding today would require that the Superior Court follow the BEC's recommendation to deny the petitioner's application for admission to the

bar. While concluding that the trial court acted improperly in rejecting the BEC's findings, we recognize that the appropriate inquiry when deciding whether to grant admission to the bar is whether the applicant has *present* fitness to practice law. See *In re Application of Pagano,* 207 Conn. 336, 345, 541 A.2d 104 (1988); accord *In re Manville,* 494 A.2d 1289, 1295 (D.C. App. 1985); *In re Application of Allan S.,* supra, 690; *In re Haukebo,* 352 N.W.2d 752, 754 (Minn. 1984); *Application of Jenkins,* 94 N.J. 458, 471, 467 A.2d 1084 (1983); *In re Application of Davis,* 38 Ohio St. 2d 273, 276, 313 N.E.2d 363 (1974). Fitness to practice law does not remain fixed in time. While the BEC found the petitioner unfit to practice law in 1989, it might not reach that conclusion today.[12] Thus, the trial court should remand the petitioner's application to the BEC for a new hearing to review any additional relevant evidence submitted by the petitioner concerning his present fitness to practice law.[13]

The judgment is reversed, and the case is remanded to the trial court with direction to remand the case to the bar examining committee for a new hearing.

In this opinion the other justices concurred.

---

[12] In this respect, fitness to practice law may be analogized to parental fitness. Although affirming the conclusion of a trial court that the statutory grounds for termination of a parent's parental rights had been proved, this court remanded a case for further proceedings for consideration of whether "any substantial change in circumstances . . . has occurred during the pendency of the appeal indicating that the ground for termination which we rely upon no longer exists." *In re Juvenile Appeal (83-BC),* 189 Conn. 66, 80, 454 A.2d 1262 (1983); cf. *In re Juvenile Appeal (Anonymous),* 177 Conn. 648, 676, 420 A.2d 875 (1979).

[13] In oral argument in this court, counsel for the BEC agreed that, under the circumstances of this case, a remand for a new hearing concerning the petitioner's rehabilitation would be appropriate.